Georgia A. Staton, Bar #004863
Gordon Lewis, Bar #015162
Barry H. Uhrman, Bar #020714
JONES, SKELTON & HOCHULI, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona 85012
Telephone: (602) 263-1700
Fax: (602) 200-7854
gstaton@jshfirm.com
glewis@jshfirm.com
buhrman@jshfirm.com

Attorneys for Defendant Tempe Union High
School District No. 213

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| LORETTA T. AVENT, a married woman, | NO. CIV 05-4211-PHX-SMM |
| Plaintiff, | **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | **(Oral Argument Requested)** |
| TEMPE UNION HIGH SCHOOL DISTRICT NO. 213, a political subdivision of the State of Arizona, | |
| Defendant. | |

Defendant Tempe Union High School District No. 213 ("the District") pursuant to Rule 56, Fed.R.Civ.P., moves this Court for summary judgment on Plaintiff's Complaint in its entirety.

**I.   Preliminary Statement**

The critical date in this case is May 11, 2005. <u>Before</u> May 11, 2005, Plaintiff Loretta Avent filed EEOC complaints and spoke out about Native American issues at Desert Vista High School. In this lawsuit, Plaintiff claims that the District retaliated against her for her speech and EEOC filings.

But <u>on</u> May 11, 2005, the District's Governing Board voted to renew Plaintiff's employment contract. The District approved Plaintiff's contract renewal fully cognizant of Plaintiffs' EEOC filings and her statements on Native American issues.

1864135.1

<u>After</u> May 11, 2005, however, Plaintiff got an injunction against harassment against her Principal, got an injunction against harassment against the Assistant Superintendent for Human Resources, got an injunction against harassment against her supervising Assistant Principal, got an injunction against harassment against the Counseling Office Receptionist, had unexcused absences from work, defied instructions from the District Office regarding work location, and followed the Principal around campus trying to bait him into violating the injunction she had issued against him. Following these insubordinate and unprofessional acts, the District Governing Board reconsidered its previous decision, and voted to rescind Plaintiff's contract offer.

Because the District has a legitimate nondiscriminatory reason for non-renewing Plaintiffs contract, and Plaintiff cannot prove that the reason is a pretext for unlawful discrimination, the District is entitled to summary judgment on all of Plaintiff's claims.

Of course, the District is entitled to summary judgment on Plaintiffs' Complaint for several other reasons. Plaintiff claims that she was retaliated against because of her speech, but her speech was not protected under *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006). Plaintiff asserts that she was retaliated against in employment under Title VI, but she fails to state a claim under Title VI because the District receives federal funds for education, not employment. Plaintiff's wrongful termination claim fails because the Plaintiff was not terminated. But the District's legitimate, nondiscriminatory reason for rescinding its contract offer - - Plaintiff's insubordinate and unprofessional behavior after May 11, 2005 --. defeats all of Plaintiffs causes of action, and the District is entitled to summary judgment on Plaintiff's Complaint in its entirety.

## II.   **Factual Background**

### A.   **Introduction**

#### 1.   <u>Desert Vista High School</u>

The underlying events relevant to this lawsuit take place at Desert Vista High School ("Desert Vista") during the 2003-2004 and 2004-2005 school years. Desert

Vista was built in 1994, and is the newest school in the District. (Defendants Statement of Fact ("DSOF") ¶1). Desert Vista's attendance area includes neighborhoods in Ahwatukee and Chandler, and also includes the Lone Butte area of the Gila River Indian Community ("GRIC"). (*Id.*)

### 2. Loretta Avent

Ms. Avent, the Plaintiff in this case, is an African-American woman who, at the time the District hired her, was 62 years of age. (DSOF ¶2). She was hired as a security guard. (DSOF ¶16). Ms. Avent had prior experience working in the Clinton Administration on Native American issues. (DSOF ¶¶22, 23). Unlike certified school teachers, security guards do not have a right to continuing employment, and are hired on year-to-year contracts. (DSOF ¶3).

### 3. The District Administration

Dr. Joe McDonald was the Desert Vista principal. (DSOF ¶ 4). He opened the school in 1994, and remained the principal until he retired after the 2005-2006 school year. (*Id.*). Dr. McDonald is an African-American male who was in his mid 60s at the time these events occurred. (*Id.*). Dr. McDonald hired Loretta Avent to work at Desert Vista. (DSOF ¶5).

Steve Adolph was the Associate Superintendent for the District. (DSOF ¶6). The Associate Superintendent is second in command in the District hierarchy and is the District's Compliance Officer for student discrimination complaints. (*Id.*).

Janet Seegren was the Assistant Superintendent for Human Resources. (DSOF ¶7). Ms Seegren oversaw personnel matters for the District and was the District's Compliance Officer for employee complaints or employment discrimination. (DSOF ¶8).

Dr. Shirley Miles was the District's Superintendent beginning the 2004-2005 school year. (DSOF ¶9). Dr. Miles, who is African-American and Asian-American, appointed Plaintiff as the parent liaison for the District, and recommended to the Governing Board that Plaintiff's contract be renewed. (DSOF ¶¶9-11). Dr. Miles also approved the recommendation to rescind Plaintiff's contract offer. (DSOF ¶12).

4. <u>The District's Non-Discrimination Policy</u>

The District has a written policy prohibiting discrimination on the basis of race, color, religion, handicap, national origin, sex, age, or socioeconomic status. (DSOF ¶13). The policy sets out procedures for employees to follow to report alleged discriminatory conduct. (DSOF ¶14). The policy specifically states that "in an occasion where the school principal is the alleged cause of a complaint of harassment and/or discrimination, the individual should report the behavior to the compliance officer, or to another administrator who shall promptly report the complaint to the compliance officer." (DSOF ¶15). Discrimination complaints to the Compliance Officer must be in writing. (*Id.*).

**B.    Plaintiff Is Hired As a Desert Vista Security Guard**

Plaintiff sought a position at Desert Vista because she lived outside the attendance area, and she wanted her granddaughter, who lived with her, to attend the school. (DSOF ¶17). Desert Vista was closed to students living outside the attendance area, but the District allowed students to attend schools where their parents or guardians are employed. (DSOF ¶18).

Plaintiff met with Principal McDonald to discuss the potential for her granddaughter to attend Desert Vista, and to discuss taking a position at the school. (DSOF ¶20). In those meetings, Plaintiff discussed her work experience with the federal government, and her familiarity with influential citizens. (DSOF ¶21). In particular, Plaintiff discussed her work with the Clinton administration. (DSOF ¶22). On her security guard application, she listed Hillary Clinton, Terry Goddard, Jack Pfiester and Frank Fairbanks as references. (DSOF ¶24). Dr. McDonald recommended that Plaintiff be hired to work at the school, and Plaintiff was hired as a security guard at Desert Vista in October 2003. (DSOF ¶¶5, 16, 25).

**C.    Plaintiff Was Assigned to Work on Native American Student Issues**

Although Plaintiff was hired as a security guard, she was also given other duties and responsibilities at the school. (DSOF ¶26). Because of her experience working

with Native Americans, Plaintiff was given the responsibility of addressing Native American student issues at the Desert Vista. (DSOF ¶¶28-29).

Plaintiff worked at Desert Vista without incident in the Spring of 2004. In the summer of 2004, the District hired Dr. Miles as the new Superintendent. (DSOF ¶27). Dr. Miles appointed Plaintiff as the Parent Liaison for the District. (DSOF ¶28). Plaintiff's responsibilities in that position included communicating with the public regarding District concerns, and, in particular, addressing issues involving Native American students. (DSOF ¶29).

### D.    Plaintiff's Granddaughter Does Not Make the Volleyball Team

In the Fall of 2004, Plaintiff's granddaughter tried out for the Desert Vista volleyball team, but was she not selected. (DSOF ¶30). Plaintiff was incensed that her granddaughter was cut from the squad. (DSOF ¶31). Dr. McDonald told Plaintiff that he supported his coaches and did not interfere in the coaches' decisions on team composition. (DSOF ¶32). Plaintiff was infuriated with Dr. McDonald for supporting his coach. (DSOF ¶33). She complained about the circumstances surrounding her granddaughter, screamed about the volleyball coach, and sought retribution against Dr. McDonald. (DSOF ¶34).

### E.    The February 8 Site Council Meeting

On February 8, 2005, Plaintiff, Dr. Miles, and a number of Native American students and parents attended the Desert Vista Site Council Meeting. (DSOF ¶35). At that meeting, Dr. Miles discussed concerns relating to nutrition and transportation issues for the Lone Butte area Gila River Indian students. (DSOF ¶36). Dr. Miles also stated that Plaintiff had been appointed the District's Parent Liaison, and that Plaintiff was working on assisting Native American students. (*Id.*). Plaintiff commented that students who performed well on the SATs would do well even if "a clown" was teaching them. (*Id.*). Some parents expressed concern that Native American students did not do well and were frequently teased. (*Id.*). Plaintiff responded by stating that plans were in place for a meeting at the Gila River Indian Community Center between the Superintendent and the

Governor of the GRIC. (*Id.*).

### F. Avent's March 25, 2005, EEOC Complaint

On March 25, 2005, Plaintiff filed her first discrimination complaint with the Equal Employment Opportunity Commission ("EEOC"). (DSOF ¶37). Plaintiff alleged that Dr. McDonald made her employment difficult "as a result of my concerns about my granddaughter being cut from the volleyball team." (*Id.*). She stated that she believed Dr. McDonald was trying to force her to resign due to her age. (*Id.*). The only discriminatory action she referenced was a claim that she was told that she would be reassigned to the farthest area of the school for campus security.[1] (DSOF ¶38).

At the time she filed the complaint, however, Plaintiff had not been assigned to the farthest area of the school. (DSOF ¶39). Instead, Plaintiff was assigned to the building closest to the administration offices, right next to the area all visitors arrive at the campus. (DSOF ¶40). Also, Dr. McDonald made the decision to hire Plaintiff. (DSOF ¶5,16) Plaintiff was 62 when he decided to hire her, and 64 when she claimed Dr. McDonald was discriminating against her based on age. (DSOF ¶2, 37). The EEOC dismissed her discrimination charge on April 21, 2005. (DSOF ¶41).

### G. Avent's March 31, 2005 EEOC Complaint

Six days after her first EEOC complaint, Plaintiff filed another charge of discrimination with the EEOC. (DSOF ¶42). In this charge, Plaintiff claimed that Dr. McDonald was retaliating against her for her "continuing to oppose the school's pattern and practice of abandoning education mission of students with color and by exercising her protection of Native American students." (*Id.*). Plaintiff stated that she had been vocal about the special transportation and nutrition needs for Lone Butte Gila River Indian students. (*Id.*). Plaintiff's second charge, however, did not identify any acts of retaliation by Dr. McDonald, and did not allege conduct covered by the EEOC. (*Id.*). On May 11, 2005, the EEOC determined that Plaintiff's second charge failed to state a claim

---

[1] Plaintiff never submitted an employment discrimination complaint to the District under the District's Non-Discrimination Policy. (DSOF ¶86).

1864135.1                                                6

under any statutes enforced by the EEOC. (DSOF ¶43).

### H. The April 26, 2005, Meeting

On April 26, 2005, representatives from the District and Desert Vista met with representatives from the Gila River Indian Community. (DSOF ¶44). Plaintiff arranged this meeting. (DSOF ¶45). Dr. Miles believed that the meeting would be a dialogue between the District and the Gila River Indian Community leaders to address issues, but she discovered that students would be in attendance, and the press was also there. (DSOF ¶46). Dr. Miles, Mr. Adolph, Nicole Greason (the District's communications liaison), Dr. McDonald, Alyssa Tarkington (Desert Vista's Special Education Department Chair) and a few Governing Board Members attended for the District. (DSOF ¶47).

At the meeting, the District discovered that they would not be allowed to discuss the school's efforts to address Native American issues. (DSOF ¶48). Instead, parents of students and former students told stories about their concerns, asserting that their kids had been called "savages" on campus, that their kids were told to "go back where you came from," and that Lone Butte students were unfairly singled out by campus security where allegations of misconduct were raised. (DSOF ¶49)

Plaintiff then arrived and stated that Desert Vista was not meeting its educational mission to Native American students. (DSOF ¶50). She also stated that Dr. McDonald was deficient as a leader. (DSOF ¶51). She attacked Dr. McDonald and his ability to run Desert Vista, and claimed that Lone Butte Native American students were not well served at the school. (DSOF ¶52). The meeting was publicized and reflected negatively on Desert Vista and the District. (DSOF ¶53).

### I. Plaintiff's May 9, 2005, EEOC Complaint

On May 9, 2005, Plaintiff filed her third EEOC Charge. (DSOF ¶54). She asserted that she had been retaliated against by Dr. McDonald for filing two previous EEOC charges and for opposing the school's pattern or practice of abandoning the educational mission of the students of color. (*Id.*). She asserted that Dr. McDonald

retaliated against her by hiring an investigator to collect information on her, by soliciting negative information about her from staff and parents, and by directing her not to speak with Native American students regarding their issues and concerns. (*Id.*). She also claimed that Dr. McDonald harassed her by telling her that nothing was going to happen with her previous EEOC charges. (*Id.*).

On May 10, 2005, Dr. McDonald contacted Ms. Seegren, stating that he had concerns regarding Plaintiff and her performance. (DSOF ¶55). Ms. Seegren told Dr. McDonald that she would need to look at her evaluations relating to her performance. Dr. McDonald signed Plaintiff's evaluations, where she received "meets standards in all categories". (DSOF ¶57). Dr. McDonald stated that he had some concerns that were not set forth in the evaluation, but Ms. Seegren did not change the administrative recommendation to issue Plaintiff a contract for the new academic year. (DSOF ¶¶ 58-59).

### J. The Governing Board Approves Rehiring Plaintiff

On May 11, 2005, after Plaintiff filed three EEOC complaints, called Desert Vista teachers "clowns", and derided Desert Vista and school officials at a public meeting, the District's administration recommended that Plaintiff's contract be renewed for the following year. (DSOF ¶60). The Governing Board accepted the Administration's recommendation, and approved issuing Plaintiff a contract to work as a security guard. (DSOF ¶61).

### K. Plaintiff Obtains Injunctions Against District Personnel

After the District approved issuing Plaintiff a new contract, however, she engaged in a series of insubordinate, inappropriate and unprofessional actions. On May 12, 2005, Plaintiff obtained and served an Injunction Against Harassment against Dr. McDonald. (DSOF ¶62). The Order stated that Dr. McDonald was not to contact the Plaintiff in person, or by telephone, and not to go on or near where Plaintiff resided. (DSOF ¶63). Because Plaintiff sought to preclude her supervisor from speaking to her, Assistant Superintendent Janet Seegren tried to meet with Plaintiff to discuss how they

could facilitate compliance with the Order until such time as it was amended or vacated by the Court. (DSOF ¶64). Plaintiff, however, refused to meet with Ms. Seegren. (DSOF ¶65). Shortly thereafter, Plaintiff informed the District receptionist that she was leaving campus for the rest of the day, despite the fact she did not receive permission to do so. (DSOF ¶66).

On May 13, 2005, the District faxed a letter to Plaintiff's counsel outlining Plaintiff's work schedule and assigned duties. (DSOF ¶67). The letter also addressed where she should park and her assigned work area. (DSOF ¶68). She was instructed not to be in the administration building where Dr. McDonald's office was located; she was not to be in the visitor parking lot near the administration building; and she was informed to use the KRONOS Electronic Clock (for clocking in and out) located in the cafeteria, not the clock located in the administration building. (DSOF ¶69).

On May 16, 2005, Plaintiff did not report to work. (DSOF ¶70). That afternoon Ms. Seegren was served with a Notice of Hearing prior to Injunction Against Harassment identifying Ms. Seegren as the Defendant and Plaintiff as the aggrieved party. (DSOF ¶71). Plaintiff also obtained injunctions against harassment against a Desert Vista Assistant Principal, and the receptionist in the counseling office. (DSOF ¶72).

**L.   Plaintiff Violates the District's Directives**

On Tuesday, May 17, 2005 Plaintiff violated the District's directives by clocking in on the KRONOS Clock in Building B, not at the clock where she was directed. (DSOF ¶¶73, 74). Plaintiff parked near the Administration Building, contrary to the directive. (DSOF ¶75). Plaintiff refused to accept any further written letter of direction from the Administration. (DSOF ¶76). Plaintiff yelled at Joe Feinstein, Lead Security Guard who was trying to deliver the letter, stating that if anything needed to be given to her it needed to go to her lawyer. (DSOF ¶77).

Later on that day, Assistant Principal Robert Cox, her assigned supervisor, began to speak to her. (DSOF ¶78). Plaintiff told him that if he continued to talk to her she would call the Sheriff and have him arrested and that he would be put in handcuffs

and taken away. (*Id.*). Plaintiff then started to follow Dr. McDonald around the campus and tried to bait him into violating the order of harassment she had issued against him. (DSOF ¶79).

After Plaintiff's disruptive conduct on May 17, 2005, Dr. Miles signed a Notice of Reassignment to Home. (DSOF ¶80). Mr. Cox attempted to deliver it to Plaintiff, but she refused to accept the written Notice. (DSOF ¶81). Based on these incidents, the District administration determined that Plaintiff was unwilling to perform her assigned duties or respond to reasonable direction from her supervisors, and she was unable to work at the high school in a reasonable and appropriate manner. (DSOF ¶82). The Administration concluded that Plaintiff's continued employment in her current position with the District could not be managed. (DSOF ¶83).

The District then recommended to the Board on June 8, 2005 to rescind the Offer of Employment to Plaintiff for school year 2005-2006. (DSOF ¶84). The Governing Board voted to rescind the employment offer for the following year. (DSOF ¶85).

Plaintiff then filed this Complaint, alleging that the rescission of her contract offer was in retaliation for her EEOC Charges, and in retaliation for her speech on Native American issues. (See Complaint). The District, however, is entitled to summary judgment on all of Plaintiff's claims.

### III. Plaintiff's Title VII Retaliation Claim Fails Because Plaintiff Cannot Show that the District's Actions Were Motivated by Retaliatory Animus

Plaintiff claims that the District took action against her in retaliation for filing complaints with the EEOC. To establish a *prima facie* case of retaliation under Title VII, Plaintiff must prove: (1) participation in a protected activity (opposition to any practice made an unlawful employment practice by Title VII) that is known to the Defendant; (2) adverse employment action; (3) causal connection between the protected activity and the adverse action. *Ray v. Henderson*, 217 F.3d 1234, 1240 ((9th Cir. 2000) (citing *Steiner v. Showboat Operating Company,* 25 F.3d 1459, 1464 (9th Cir. 1994)).

Plaintiff cannot succeed on her Title VII claim. Plaintiff asserts that she was retaliated against by Dr. McDonald "for filing two previous charges of employment discrimination . . . and for opposing the school's pattern and practice of abandoning the educational mission of the students of color." (DSOF ¶54). Her May 9, 2005, EEOC Charge states that she suffered the following adverse employment actions: 1) Dr. McDonald hired an investigator to collect information on her; 2) tried to solicit negative information about her from staff and parents; 3) directed her not to speak with Native American students regarding their concerns; and 4) said nothing was going to happen with her EEOC charges. (*Id.*) In addition, her July 5, 2005, amended charge states that she was terminated from her security guard position on June 8, 2005. (DSOF ¶87).

With respect to all of the actions involving Dr. McDonald, Plaintiff's retaliation claim fails because there is no competent evidence to support any of these assertions. Mr. McDonald specifically denies hiring an investigator to collect information on Plaintiff, soliciting negative information about Plaintiff, directing Plaintiff not to speak to Native American students, or speaking to Plaintiff about the EEOC charges. (DSOF ¶89). The Plaintiff does not have evidence to create a genuine issue of material fact this conduct occurred.

In addition, none of Dr. McDonald's alleged actions qualify as adverse employment actions. For employer conduct to be retaliatory under Title VII, the conduct must be <u>materially</u> adverse. *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405, 2414 (2006). The conduct must be sufficiently severe to dissuade a reasonable worker from making or supporting a charge of discrimination; trivial harms cannot support a retaliation claim. *Id.* Here, Plaintiff was, in no way, dissuaded from speaking out on her perceived issues, and mere increased scrutiny do not support a retaliation claim. *See Signal v. Gonzales*, 430 F.2d. 528, 541 (D.S.C. 2006). These actions do not support these retaliation claims because they are not materially adverse.

Furthermore, for all of the conduct listed in the amended EEOC charge, including the District's rescission of the offer of contract, Plaintiff cannot demonstrate

1864135.1                                    11

that any of the alleged retaliatory conduct resulted from protected activity. Plaintiff must show that but for engaging in protected activity, the adverse employment action would not have occurred. On the face of her May 9, 2005, charge, Plaintiff states that her "opposing the school's pattern and practice of abandoning the educational mission of the students of color" was the reason for the District's actions. (DSOF ¶54). Opposing the District's practices relating to students, however, is not protected activity under Title VII. If, as Plaintiff claims, opposing the school's practices towards students was the motivation for the District's conduct, Plaintiff fails to state a claim for retaliation under Title VII.

Most importantly, Plaintiff cannot demonstrate that the District's legitimate non-discriminatory reason for rescinding its approval of her contract is a pretext for retaliation. The District was completely aware of the Plaintiff's EEOC filings when the Administration recommended – and the Governing Board voted – to approve awarding the Plaintiff a contract for the following academic year. (DSOF ¶¶53, 60). Plaintiff then engaged in a series of unprofessional and insubordinate acts, which caused the District to rescind that award. Because of the timing of the actions in this case, it is impossible for Plaintiff to contend that retaliation for filing the EEOC charges was the true motivation for the District rescinding its approval of the Plaintiff's next contract. The Plaintiff cannot demonstrate a causal connection between her protected activity and an adverse employment action, so the District is entitled to summary judgment on Plaintiff's entire Title VII claim.[2]

---

[2] Plaintiff's first two EEOC complaints failed to state claims that are covered by Title VII. One states that Plaintiff is being discriminated against because of her age (not covered by Title VII) and discriminated against when she complained about her granddaughter being cut by the volleyball team (not covered by Title VII). In the second claim, she alleges she is being retaliated against for opposing the school's "pattern and practice of abandoning the educational mission of students of color" (not covered under Title VII). The District is entitled to summary judgment on those claims as well.

The District is also entitled to summary judgment on Plaintiffs Title VII claims under the *Faragher/Ellerth* defense.

1864135.1                                      12

IV. **Plaintiff's First Amendment Claim Fails Because Plaintiff's Speech Was Not Protected and Plaintiff's Speech Did Not Motivate the District's Contract Rescission**

Plaintiff further asserts that the contract rescission violated her First Amendment Rights. In order to state a First Amendment free speech employment claim, Plaintiff must prove: (1) that her speech was as a citizen involving a matter of public concern, which must be determined by the "content, form and context of a given statement." *City of San Diego, California v. Roe*, 543 U.S. 77, 83-84, 125 S.Ct. 521, 525-26 (2004), *quoting Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690 (1983); and (2) that the alleged adverse employment decision was caused by the protected activity. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576 (1977).

Here, Plaintiff's speech was not protected because she was not speaking as a citizen. Plaintiff admits that her job responsibilities included addressing Native American student issues at Desert Vista. (DSOF ¶¶26-29). Plaintiff was appointed the Parent Liaison. (DSOF ¶28). In Plaintiff's work capacity, she arranged the meeting where she made comments about Native American students at Desert Vista. DSOF ¶¶44-46). Her comments involved her assigned duties.

When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communication from employer discipline. *Garcetti v. Ceballos*, 126 S.Ct. 1951, (2006). Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties Plaintiff might have enjoyed as a private citizen, but simply reflects the exercise of employer control over what the District has commissioned or created. *Garcetti*, 126 S.Ct. at 1960. Because Plaintiff's speech involved her assigned duties for the District, she cannot claim that her speech was constitutionally protected.

Even if Plaintiff were able to demonstrate that her speech was protected, the District would still be entitled to summary judgment. The District decided to renew

Plaintiff's contract <u>after</u> her statements at the April 26, 2005 meeting. (DSOF ¶60). After the District voted to renew her contract, on May 11, 2005, Plaintiff engaged in insubordinate and unprofessional acts. Only then did the Board reconsider its previous decision, and vote to rescind Plaintiff's contract offer. (DSOF ¶85). The District had a legitimate, nondiscriminatory reason for rescinding its contract offer. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576 (holding that even if a public employee can demonstrate that her speech was protected, an employer still prevails by showing that it would have reached the same decision in the absence of the protected conduct). Because Plaintiff cannot prove that the District's legitimate nondiscriminatory reason for non-renewing her contract is a pretext for unlawful discrimination, the District is entitled to summary judgment on Plaintiff's claim for wrongful termination under 42 U.S.C. § 1983.

## V.     **Plaintiff Cannot Prove a Violation of the Arizona Employment Protection Act**

Plaintiff claims the District violated Arizona's Employment Protection Act ("EPA") by terminating her in retaliation for her public comments and in violation of her right to continued employment. To succeed on her EPA claim, Plaintiff must demonstrate that the District terminated her employment in retaliation for Plaintiff's (1) refusal to commit an act or omission that would violate the Arizona Constitution or statutes, or (2) disclosure, in a reasonable manner, of a District violation of the Arizona Constitution or Arizona statutes, to a manager or supervisor who has the authority to investigate the information provided and to take action to prevent future violations. A.R.S. §§ 23-1501(3)(c)(i)-(ii). As a matter of law, Plaintiff cannot establish the requisite elements of her claim.

First, Plaintiff's wrongful termination claim fails because the Plaintiff was not terminated. Plaintiff had an employment contract for the 2004-2005 school year, and that contract expired on May 26, 2005. (DSOF ¶90). The Plaintiff never signed, and Plaintiff was not ultimately offered, an employment contract for the 2005-2006 school year. Under Arizona law, school security guards do not have a right to continued employment. *Wallace v. Casa Grande Union High School District No. 82 Bd of*

*Governors*, 184 Ariz. 419, 426-27, 909 P.2d 486-493-94 (App. 1995).  Arizona does not recognize a claim for wrongful failure to hire.  *Mintz v. Bell Atlantic Systems Leasing Intern. Inc.*, 183 Ariz. 550, 553, 905 P.2d 559, 562 (App. 1995); *Burris v. City of Phoenix*, 179 Ariz. 35, 43, 875 P.2d 1340, 1348 (App. 1993).  Because Plaintiff was not terminated from her position with the District, the District is entitled to summary judgment on her wrongful termination claim.

In addition, Plaintiff asserts she was "terminated" in retaliation for "refusing to violate the Arizona Civil Rights Act and other Arizona statutes."  (Amended Complaint, ¶36).  The only statute she identified to support her claim is the Arizona Civil Rights Act.  The EPA, however, specifically states that the Arizona Civil Rights Act ("ACRA") contains its own remedy and cannot provide the basis for a wrongful discharge tort claim. A.R.S. § 23-1501(3)(b)(i); *Taylor v. Graham County Chamber of Commerce*, 201 Ariz. 184, 188, 33 P.3d 518, 522 (App. 2001).  Thus, as a matter of law, Plaintiff cannot state a claim under the EPA.

Plaintiff also claims she was "terminated" in retaliation for "refusing to acquiesce to numerous unlawful and unethical demands of certain District personnel."  (Amended Complaint, ¶36).  Although, the EPA authorizes wrongful discharge claims where an employee has been terminated for refusing to violate the Arizona Constitution or statute, there is no evidence indicating that Plaintiff was directed to do so.  A.R.S. § 23-1501(3)(c)(i).

Plaintiff also asserts she was "terminated" in retaliation for public statements regarding Native Americans.  To state a claim under the EPA, however, Plaintiff must demonstrate she disclosed a violation of the Arizona Constitution or Arizona statutes, and that her disclosure was made to a person in authority in a reasonable manner.  A.R.S. § 23-1501(3)(c)(ii).  Plaintiff never stated that the District was violating the Arizona Constitution or an Arizona statute, and Plaintiff did not disclose the information in a reasonable manner.  So, Plaintiff cannot state a claim under the EPA.

Plaintiff asserts that she was "terminated" in violation of her right to

continued employment in violation of A.R.S. § 23-1501(3)(d). (Amended Complaint, at ¶ 41. As discussed above, however, school security guards do not have property right in continued employment. *Wallace v. Casa Grande Union High School Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 426-27, 909 P.3d 486, 493-94 (App. 1995).

More importantly, as discussed above, Plaintiff cannot show that she was terminated in retaliation for her comments at the April 26, 2005, meeting. The District, fully aware of her comments and their ramifications, approved renewing Plaintiff's contract on May 11, 2005. (DSOF ¶60). The District decided to rescind its approval of the Plaintiff's contract because of her insubordinate and unprofessional conduct <u>after</u> May 11, 2005. (DSOF ¶85). Because the Plaintiff cannot prove that the District's legitimate nondiscriminatory reason for not offering Plaintiff a new contract is a pretext for unlawful discrimination, the District is entitled to summary judgment on Plaintiff's claim for wrongful termination under the EPA.

**VI.     Plaintiff Cannot State a Claim for Retaliation under Title VI**

Finally, Plaintiff claims that the District retaliated against her in violation of Title VI. Title VI prohibits discrimination on the basis of race, color, or national origin in programs and activities receiving federal financial assistance. 42 U.S.C. § 2000d. Title VI, however, was not meant to be the primary federal vehicle to prohibit employment discrimination. Title VI only prohibits employment discrimination by recipients of federal financial assistance if the "primary objective" of the federal financial assistance recipient is to promote employment. 42 U.S.C. § 2000d-3.

Thus, to sustain a claim of employment discrimination under Title VI, not only must Plaintiff establish that the District received federal financial assistance, but also that the "primary objective" of the federal funding is to provide employment. In order to establish a Title VI violation, Plaintiff must prove: (1) that she was subjected to discrimination on the basis of race or national origin; (2) that the District receives federal financial assistance; and (3) that the primary purpose of the federal financial assistance is to provide employment. *Reynolds v. School Dist. No. 1 of Denver Colo.*, 69 F.3d 1523,

1531 (10th Cir. 1995); *see also Sims v. Unified Gov't of Wyandotte County/Kansas City, Kansas*, 120 F. Supp.2d 938, 954 (D. Kan. 2000), *citing Reynolds*, 69 F.3d at 1531.

*Reynolds v. School Dist. No. 1 of Denver Colo.*, *supra.*, illustrates this point. In *Reynolds*, a white bilingual education teacher brought action against the public school district, alleging race discrimination and various state law claims. The court noted that covered entities can only be sued for employment discrimination under Title VI where the primary objective of the federal financial assistance to that program or activity is to provide employment. *Reynolds*, 69 F.3d at 1531. The teacher could not establish a Title VI claim against the school district, because the teacher failed to present evidence that the federal funds the district received were for the primary objective of providing employment. *Reynolds*, 69 F.3d at 1531. *See also, Association Against Discrimination in Employment v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981) (to recover under Title VI against an employer for discriminatory employment practices, employer must be the recipient of federal funds aimed primarily at providing employment), *cert. denied*, 455 U.S. 988 (1982); *Gilmore v. University of Rochester*, 410 F. Supp.2d 127, 132 (W.D.N.Y. 2006) (Title VI claim fails in absence of any allegation that the federal funds received by university were primarily intended to provide employment); *Thornton v. National R.R. Passenger Corp.*, 16 F. Supp. 2d 5, 6-7 (D.D.C. 1998) (complaint dismissed because primary objective of funding was to promote transportation, not employment).

Here, as in *Reynolds*, Plaintiff cannot establish the requisite elements of her Title VI claim. The District receives federal funds for education, not employment. As a matter of law, Defendants are entitled to summary judgment on Plaintiff's Title VI claim.[3]

**VII. Conclusion**

For the following reasons, the District respectfully requests that it be granted summary judgment on Plaintiff's Complaint in its entirety.

---

[3] The District is also entitled to summary judgment on Plaintiff's Title VI claim because Plaintiff cannot demonstrate that the District's legitimate non-discriminatory reason for non-renewing Plaintiff's contract – Plaintiff's insubordination after May 11, 2005, is a pretext for Title VI retaliation.

1864135.1                                                17

DATED this 18th day of January, 2008.

JONES, SKELTON & HOCHULI, P.L.C.


By  /s/ Gordon Lewis
    Georgia A. Staton
    Gordon Lewis
    Barry H. Uhrman
    2901 North Central Avenue, Suite 800
    Phoenix, Arizona  85012
    Attorneys for Defendant Tempe Union
    High School District No. 213

**ORIGINAL electronically filed** January 18, 2008.

**COPY** of the foregoing **hand-delivered** January 22, 2008, to:

The Honorable Stephen M. McNamee
United States District Court
401 West Washington Street, SPC 60
Phoenix, Arizona 85003

**COPY** of the foregoing **e-mailed** January 18, 2008, to:

William R. Hobson, Esq.
LAW OFFICE OF WILLIAM R. HOBSON
7303 West Boston Street
Chandler, Arizona  85226
*Attorney for Plaintiff*


 /s/  Anita Allmon

1864135.1

18